```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
                                         :       ECF CASE
ENA MAE BACQUIE,                         :
                                                 05 Civ. 6886 (WCC)
                    Plaintiff,           :

     - against -                         :       OPINION
                                                 AND ORDER
LIBERTY MUTUAL INSURANCE CO. and         :
LIBERTY LIFE ASSURANCE CO. OF BOSTON,
                                         :
                    Defendants.
                                         :
- - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

        LAW OFFICE OF RAYMOND NARDO
        **Attorneys for Plaintiff**
        129 Third Street
        Mineola, New York 11501

RAYMOND NARDO, ESQ.

    Of Counsel

        CHORPENNING, GOOD, CARLET
          & GARRISON, ESQS.
        **Attorneys for Defendants**
        645 Fifth Avenue
        New York, New York 10022

MICHAEL J. ZARETSKY, ESQ.
VIRGINIA T. SHEA, ESQ.

    Of Counsel

**COPIES E-MAILED TO COUNSEL OF RECORD**

**CONNER, Senior D.J.:**

Plaintiff Ena Mae Bacquie brings this action pursuant to the Employees' Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against her former employer, Liberty Mutual Insurance Company ("Liberty"), and the sponsor of its Group Disability Income Policy (the "Plan"), Liberty Life Assurance Company of Boston (collectively, "defendants").  Plaintiff seeks a determination that defendants acted arbitrarily and capriciously in offsetting her long term disability ("LTD") benefits by the amount of plaintiff's Social Security Disability Income ("SSDI").  She also seeks payment of those offset sums.  Resolution of this dispute requires this Court to determine the meaning of the phrase "same Disability" in the context of multiple disabling medical conditions in order to assess the validity of Liberty's LTD benefit reduction.

Presently before the Court are the parties' cross-motions for summary judgment.  For the reasons contained herein, defendants' motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

**BACKGROUND**

In January 2000, Bacquie began working as a senior case manager at Liberty.  (Pl. Rule 56.1 Stmt. ¶ 1; Defs. Rule 56.1 Stmt. ¶ 37.)  Approximately three months later, Bacquie reported a disability claim after her physician "took her off work" as a result of fainting spells and seizures.  (AR 149-50, 1375-76, 1377.)[1]  During this period, Liberty provided plaintiff with short term disability ("STD") benefits in accordance with the terms of its STD plan.  (AR 1375.)  However, after she returned to work on May 2, 2000, Bacquie's physician "took her back out of work" on May

---

[1] "AR" refers to the consecutively paginated Administrative Record filed by plaintiff.

1

31, 2000 in order to investigate the cause of her continued fainting spells (AR 148), at which point Liberty opened a new STD claim.  (AR 145; 1296-99.)

On June 20, 2000, Niels H. Lauersen, M.D. completed a disability claim form on behalf of plaintiff citing complaints of pelvic pain, abdominal pain and bleeding.  (AR 285.)  The form notes that Dr. Lauersen performed dilation and curetage with a laparoscopy on June 7, 2000.[2]  (AR 148, 285; *see also* AR 1321-23.)  Another of Bacquie's doctors, C. Goldberg, M.D., found that plaintiff suffered from a seizure disorder (AR 147); he completed a restriction form in early June 2000 indicating plaintiff would not return to work until July 15, 2000.[3]  (AR 1316.)  However, Stephen L. Sowinski, M.D., who replaced Dr. Goldberg as plaintiff's internist, completed a restriction form on August 9, 2000 diagnosing Bacquie with Addison's Disease (an endocrinological disorder), Sjogren's Syndrome (an autoimmune disorder), orthostatic hypotension and syncope (fainting) and stating that, as a consequence, she could not return to work.  (AR 1235; *see also* AR 139.)  Dr. Sowinski noted that Bacquie's disability was compounded by depression, for which Bacquie received medical care.  (AR 134-37, 1203, 1212, 1219.)  Although Sowinski repeatedly pushed back plaintiff's expected date of return to work (AR 135-37, 1196-97, 1201-04), he indicated on October 27, 2000 that she was permitted to return to "light duty" on October 30, 2000. (AR 1187.)  Martin A. Hurwitz, M.D., Bacquie's psychiatrist, who found Bacquie suffered from a "Major Depressive Order," further restricted plaintiff's work ability to no more than six hours per day.  (AR 1186; *see*

---

[2] The operation revealed that plaintiff suffered menometrorrhagia, ovarian cysts, pelvic endometriosis and extensive pelvic adhesions.

[3] Liberty's internal claim notes contain the following entry questioning plaintiff's disability following Liberty's review of plaintiff's medical data: "I do not see why [claimant] is unable to work[;] her job is not heavy and she does not operate heavy [equipment].  More information is needed to substantiate disability."  (AR 147.)

*also* AR 134.)  Liberty paid plaintiff STD benefits for this period of disability as well.  (AR 1192-93.)

After returning to work at the end of October, Bacquie left work again on November 6, 2000 because, according to plaintiff, Liberty failed to comply with the medically mandated work restrictions. (AR 1182-83. *But see* AR 131-33 (providing Liberty's account of its accommodations).) Drs. Hurwitz and Sowinski subsequently filled out restriction forms indicating that Bacquie's depression had rendered her totally disabled.  (AR 1175-76; *see also* 130-32.)  In accordance with the terms of its STD plan, Liberty informed plaintiff that since she had not returned to work for more than six months following her last disability period, her STD benefits were "successive," and therefore did not constitute a new claim.[4]  (AR 130-32, 1173-74; *see also* 19.)  Accordingly, Liberty reopened plaintiff's previous STD claim and began to pay her benefits on November 6, 2000.  (AR 1167-68, 1171-74.)

Given the 180-day STD benefit limit, plaintiff's STD benefits were set to expire on December 5, 2000. (AR 1167.) Liberty informed plaintiff of her eligibility for LTD benefits, which she applied for and received on December 14, 2000. (AR 1152-54.) Bacquie's LTD benefits were authorized subject to the Plan's 18-month limitation for a mental illness because Liberty concluded that her primary diagnosis was a mental disorder.[5]  (AR 1152-53.)  In addition, the letter instructed

---

[4] The Plan defines "Successive Periods of Disability" as "a Disability which is related or due to the same cause(s) as a prior Disability . . . " that prevents the employee from returning to work following a period of disability for less than six continuous months.  (AR 19.)  The Summary Plan Description ("SPD"), in explaining the effects of becoming "Disabled Again," states: "If you return to work and become totally disabled again from the same injury or sickness, your recurrent disability will be treated as a continuation of the original disability."  (SPD at D-2-4.)

[5] The Plan states that "[t]he Benefit for Disability due to Mental Illness will not exceed 18 months . . . unless the Covered Person meets" one of several defined situations, inapplicable in the

3

that Bacquie was "expected to apply for Social Security Disability Income ("SSDI") benefits" where a disability is expected to last beyond twelve months. (AR 1154.) It also noted that plaintiff's failure to apply for SSDI benefits would result in an automatic reduction in LTD benefits "by an amount equal to your anticipated SSDI benefit." (*Id.*)

On January 2, 2001, Peter M. Mirkin, M.D. conducted a peer review of plaintiff's file at Liberty's request. Dr. Mirkin opined that plaintiff suffers from Systemic Lupus Erythematosus, but his report was ultimately unable to conclude whether "her psychiatric condition is a primary impairing condition or whether it is secondary to one of her medical conditions." (AR 1144.)

Plaintiff was examined on January 17, 2001 by neurologist Morton Finkel, M.D., who diagnosed major motor epilepsy and panic attacks in addition to Sjogren's Syndrome and Addison's Disease; he prescribed Dilantin. (AR 1127.) This diagnosis was communicated to Liberty by Dr. Finkel at Liberty's request. (AR 1128-31; 1135-36.) Liberty requested responses to specific questions regarding plaintiff's condition from Dr. Finkel on March 16, 2001. (AR 1113-14.) In addition, Liberty sought medical records, test results and answers to specific questions on multiple occasions from plaintiff's rheumatologist, Stelios Viennas, M.D., and endocrinologist, Vincent Yen, M.D. (AR 1109, 1116-21.) The record shows that Liberty was provided with all this information. (AR 1101-05.) Both plaintiff's neurologist and rheumatologist independently indicated that plaintiff was permanently and totally disabled. (AR 1101, 1104.)

In an email dated January 11, 2001, Claims Case Manager Deneen DeCost contacted Managed Disability Nurse Barbara Desjardins, RN and informed her that, due to the complexity of plaintiff's case, Liberty would "like to aggressively manage" her claim. (AR 1138.) In a May 8,

---

instant case, involving confinement to a hospital or mental health institution. (AR 16.)

4

2001 email, DeCost informed Liberty Team Manager Michael Bisson that Desjardins was "leaning more toward a physical disability of Sjogren's Disease with a resultant complication of Addison's Disease as the primary diagnosis," and that plaintiff's depression was caused by "the high levels of steroids she is taking for pain[,] and is really a secondary diagnosis." (AR 1097; *see also* AR 81, 97, 100, 104.)

On May 11, 2001, Bacquie was awarded SSDI benefits retroactive to April 23, 2000. (AR 1084-87.) As a result of this award, Liberty determined that it had overpaid LTD benefits to plaintiff, and requested and received reimbursement in those amounts from her. (AR 82, 93.)

Liberty again conducted a peer review of plaintiff's case in June 2001. Laura K. O'Malley, M.D. submitted a report that was inconclusive regarding the disabling effects of Bacquie's various conditions. (AR 1068-70; *see also* AR 81.) Liberty then requested and received Claimant's Supplementary Statement, in which Bacquie stated that her multiple conditions left her with "inconsistent health" resulting in permanent disability. (AR 1058-62.) This conclusion was supported by reports filed by Drs. Finkel, Hurwitz and Viennas. (AR 924, 939-40, 1040, 1042.) The findings of Jill P. Buyon, M.D., who conducted an independent medical examination of plaintiff on March 19, 2002, confirmed the unpredictable health pattern caused by plaintiff's multiple conditions. (AR 955-63.)

As noted above, Liberty originally classified plaintiff's primary illness as psychiatric, thus limiting LTD benefit payments to only 18 months. On January 14, 2002, Liberty informed plaintiff that due to its continued primary classification of a psychiatric disability, plaintiff's LTD benefits would expire on June 5, 2002. (AR 1005-06.) However, after receiving Dr. Buyon's report, Liberty reclassified plaintiff's primary condition as Systemic Lupus Erythematosus with a secondary

condition of Sjogren's Syndrome thereby eliminating the 18-month limit. (AR 48-50, 950.)

On May 21, 2004, Bacquie wrote to Liberty questioning its reduction of her LTD benefits in an amount equal to her SSDI benefits. (AR 773-96; *see also* AR 33.) The Social Security Administration ("SSA") awarded plaintiff benefits in May 2001 based on its conclusion that plaintiff suffered from schizophrenia and anxiety disorder. (AR 775; *see also* AR 1084-87.) Bacquie argued in her letter to Liberty that because her SSDI benefits were based on a different diagnosis than Liberty's revised diagnosis, it did not qualify as the "same Disability" under the Plan.[6] (AR 773.)

---

[6] According to the Plan, "Disability" or "Disabled" is defined as:

i. If the Covered Person is eligible for the 18 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 18 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

ii. After 18 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(AR 7.) The SPD defines the same terms as

- for the first 18 months of Long-Term Disability, that the employee is unable to perform all the material and substantial duties of his or her regular occupation because of injury or sickness; and

- after 18 months of Long-Term disability, that the employee is unable to perform all of material and substantial duties of his or her own or any other occupation for which he or she is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(SPD at D-2-2.) The Plan permits Liberty to deduct from its disability payments the amount of "Benefits from Other Income," which include, in pertinent part:

6

Liberty contended in its response letter of June 2, 2004 that Liberty awarded benefits as "a result of [plaintiff's] co-morbid (physical and psychiatric) medical conditions," and that she "ceased work due to [her] <u>disability</u>, which includ[ed] both physical and psychiatric diagnoses." (AR 753 (emphasis in original).) It further asserted that Benefits from Other Income are reduced by receipt of SSDI benefits "payable as a result of the same <u>disability</u>, not diagnosis." (*Id.* (emphasis in original).)

---

> 4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, for which:
>
>    a. The Covered Person receives or is eligible for; and
>
>    b. his spouse, child or children receives or are eligible for because of his Disability; or
>
>    c. his spouse, child or children receives or are eligible for because of his eligibility for Retirement Benefits.

(AR 17.) "These Benefits from Other Income . . . must be payable as a result of the same Disability for which Liberty pays a benefit." (*Id.*) The SPD, however, under a provision entitled "Coordination of Benefits," states:

> Long-Term Disability benefits are reduced by the amount of any and all of the following benefits you are eligible to receive: workers' compensation, Social Security (including benefits for your spouse and children on account of your disability), special statutory disability benefits, no-fault benefits, or any group insurance plan benefits. If you are eligible, you are expected to apply for these benefits. Long-Term Disability benefits are also reduced by any benefits you are receiving under the Liberty Mutual Retirement Benefit Plan.
>
> You are expected to apply for Social Security Disability Income (SSDI) benefits when you are receiving Long-Term Disability. You will be requested to show proof that you have applied for these benefits. Failure to show proof of application can result in a reduction in your biweekly Long-Term Disability benefit payment by an amount equal to your anticipated SSDI benefit.

(SPD at D-2-7 to D-2-8.)

Counsel for Bacquie then argued in a letter dated August 3, 2004 that schizophrenia constitutes a different diagnosis and disability because of its independently disabling effects, and that Liberty could not consider it the same disability because its file on Bacquie was devoid of any mention of schizophrenia.  (AR 660-61.)  Liberty responded in a letter dated August 18, 2004 that after reviewing Bacquie's file in its entirety, the reduction remained appropriate.  (AR 222-25.)  Specifically, Liberty argued that it never concluded that Bacquie was no longer disabled by her psychiatric diagnosis.  (AR 224.)  Moreover, its "'Disability' analysis is not contingent on a single or specific diagnosis and Liberty fully considers co-morbid conditions in [its] assessment of a Covered Person's Disability."  (*Id.*)  Plaintiff then filed her instant action.

## DISCUSSION

I. **Standard of Review**

    A. **Summary Judgment Standard**

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986).  A fact is material only if, based on that fact, a reasonable jury could find in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.  To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

B.     **ERISA Review Standard**

As an initial matter, it is necessary to determine the appropriate standard for reviewing Liberty's determination to offset plaintiff's LTD benefits by the amount of her SSDI benefits. In *Firestone Tire and Rubber Company v. Bruch*, which addressed "the appropriate standard of judicial review of benefit determinations by fiduciaries or plan administrators under ERISA," the Supreme Court determined that such a review should be examined under a "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 105, 115 (1989); *see also Fay v. Oxford Health Plan*, 287 F.3d 96, 103-04 (2d Cir. 2002); *Lee v. Aetna Life & Casualty Ins. Co.*, No. 05 Civ. 2960, 2006 WL 345854, at *1 (S.D.N.Y. Feb. 13, 2006).

The Court cautioned, however, that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115. Administrators operate under a conflict of interest where they "function as both fiduciaries and as administrators." *Lee*, 2006 WL 345854, at *1. "The Second Circuit has time and again noted that a deferential review (*i.e.*, abuse of discretion) applies to ERISA claims determination cases where the administrator has discretion, even where a structural conflict of interest exists." *Id.* at *2. In *Sullivan v. LTV*

9

*Aerospace and Defense Company*, the Second Circuit laid out the following test for determining the standard of review in cases involving conflicted administrators:

> [I]n cases where the plan administrator is shown to have a conflict of interest, the test for determining whether the administrator's interpretation of the plan is arbitrary and capricious is as follows: Two inquires are pertinent. First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was *in fact* influenced by such conflict. If the court finds that the administrator was *in fact* influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the standard *de novo*.

82 F.3d 1251, 1255-56 (2d Cir. 1996) (emphases added). "Under this rubric, the court 'adhere[s] to the arbitrary and capricious standard of review in cases turning on whether the decision was based on an alleged conflict of interest, unless the conflict affected the choice of a reasonable interpretation.'" *Lee*, 2006 WL 345854, at *2 (quoting *Sullivan*, 82 F.3d at 1255). "'If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the standard de novo.'" *Elsroth v. Consol. Edison Co. of N.Y., Inc.*, 10 F. Supp. 2d 427, 434 (S.D.N.Y. 1998) (Conner, J.) (quoting *Sullivan*, 82 F.3d at 1256). "The plan administrator bears the burden of proving that the deferential standard of review applies." *Fay*, 287 F.3d at 104.

In the case at bar, Liberty's Plan expressly states, under the section title "Interpretation of the Policy," that

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(AR 24.) The SPD for Liberty's Plan contains nearly identical language. (SPD at D-2-10.) The Court has no doubt that this provision confers discretionary authority warranting review under an

arbitrary and capricious standard. *See*, *e.g.*, *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) (finding identical language granted required discretion); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995).  Nevertheless, it cannot be denied that Liberty is acting under a potential conflict of interest, "as the company both makes the disability determination and also pays out on the policy." *Lee*, 2006 WL 345854, at *3; *see also Calvert*, 409 F.3d at 292.  However, this Court finds no evidence that Liberty's decision to offset plaintiff's LTD benefits was affected by this potential conflict.  Indeed, the administrative record is replete with letters and internal notes commenting on the difficulty plaintiff's co-morbid conditions presented and recording Liberty's utilization of medical experts to arrive at a definitive position.  Although the administrative record contains comments early on questioning the veracity of plaintiff's disability and later on stating it wanted to "aggressively manage" her claim, these comments are qualified by the need for more information, with decisions postponed until that information was obtained.  Moreover, the Court observes that plaintiff's comments toward the Liberty claims managers with whom she dealt could most aptly be described as hostile.

Accordingly, we will apply the arbitrary and capricious standard of review in this action. "The arbitrary and capricious standard of review is highly deferential to a plan administrator." *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995).  Under this standard, the Court may overturn the administrator's interpretation only if was not "'based on a consideration of the relevant factors'" or where "'there has been a clear error of judgment.'" *See id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). "The court may not upset a reasonable interpretation by the administrator." *Id.*

### C.     Plan Interpretation

"ERISA plans are construed according to federal common law." *Fay*, 287 F.3d at 104 (citing *Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991)). The federal common law governing ERISA "embodies common-sense canons of contract interpretation." *Brooke v. Home Life Ins. Co.*, 864 F. Supp. 296, 299 (D. Conn. 1994). Thus, courts review ERISA plans within the context of the entire agreement, "giving terms their plain meanings." *Fay*, 287 F.3d at 104; *see also U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571-72 (2d Cir. 1991). Therefore, a court may not create an ambiguity by "[s]training a contract's language beyond its reasonable and ordinary meaning." *Swensen v. Colonial Life Ins. Co. of Am.*, No. 91 Civ. 5793, 1993 WL 378470, at *2 (S.D.N.Y. Sept. 22, 1993). "Nor may an ambiguity be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 149 (2d Cir. 1993). In interpreting the plan, "where it is necessary for a reviewing court to choose between two competing yet reasonable interpretations of a . . . plan, this court must accept that offered by the administrators." *Pagan*, 52 F.3d at 443; *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 320 (S.D.N.Y. 2001) (Conner, J.).

Yet, "[w]here the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983); *see also Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 93 (2d Cir. 2000). Where an ERISA-plan term is truly ambiguous, it is to be construed

against the insurer. *See Masella*, 936 F.2d at 107; *see also Elsroth*, 10 F. Supp. 2d at 438. "'Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement.'" *Fay*, 287 F.3d at 104 (quoting *O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 59 (2d Cir. 1994) (internal quotation marks and citations omitted)). The same is true under New York law. *See, e.g., Elsroth*, 10 F. Supp. 2d at 438-39 (collecting New York cases). "'Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone.'" *Fay*, 287 F.3d at 104 (quoting *O'Neil*, 37 F.3d at 58-59).

"Under ERISA, employers offering pensions and benefits plans covered under its statutory scheme must distribute a Summary Plan Description ("SPD") to participants in those plans." *Winter v. Hartford Life & Accident Ins. Co.*, 309 F. Supp. 2d 409, 414 (E.D.N.Y. 2004); *see also* 29 U.S.C. § 1024(b)(1). When "'the terms of a plan and the SPD conflict, the SPD controls.'" *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003) (quoting *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08 (2d Cir. 1990)). "This may be startling at first blush but it makes sense when it is recalled that the SPD 'will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary.'" *Id.* (quoting *Heidgerd*, 906 F.2d at 907). "However, 'by definition, a summary will not include every detail of the thing it summarizes.'" *Winter*, 309 F. Supp. 2d at 414 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 401 (6th Cir. 1998)). Therefore, "'[a]n omission from the summary plan description does not, by negative implication, alter the terms of the plan itself.'" *Id.* (quoting *Sprague*, 133 F.3d at 401).

II.     **Analysis**

   A.     **Interpretation of "Same Disability"**

As noted above, the Plan language indicates that LTD benefits conferred under the Plan are reduced by "Benefits from Other Income," including SSDI benefits, where "payable as a result of the same Disability for which Liberty pays a benefit." The crux of plaintiff's contention is that "Disability" must be interpreted as synonymous with "diagnosis." Plaintiff argues that Liberty's reduction of its LTD payments based on plaintiff's receipt of SSDI benefits is contrary to the terms of the Plan because plaintiff's SSDI benefits were based on an independent diagnosis of schizophrenia that predated both her numerous physical ailments and accompanying depression and anxiety disorder. Liberty asserts that its decision to offset Bacquie's LTD benefits is in accordance with a reasonable interpretation of the Plan language. Liberty does not interpret "same Disability" to mean the same diagnosis, but rather the concurrence of the time periods during which the several ailments render the Plan participant unable to work. While we are sympathetic to plaintiff's plight, we are inclined to agree with defendants.

As defined by the Plan, "Disability" means, in pertinent part, that "the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness."[7] It is clear to the Court that "Disability" refers to the effect, *i.e.*, the inability to sustain employment, rather than the cause, *i.e.*, the specific condition preventing employability. Indeed, other than as relates to determining successive periods of disability, nowhere in the Plan or the SPD is receipt of benefits contingent on an individual's

---

[7] "Sickness" is defined as "illness, disease, pregnancy or complications of pregnancy." (AR 8.)

"sickness." Rather, it is this inability to work that entitles the Plan participant to receive disability income. The phrase "same Disability" is used to limit the potential offset attributed to other sources of income—here SSDI benefits—to a defined period of disability, regardless of how many or few separate medical conditions render the covered person unable to work. By refusing to equate disability with diagnosis, Liberty prevents Plan participants from receiving benefits in excess of their contractual entitlement by recovering benefits from Liberty for one "sickness" and then again from the SSA for another "sickness" that disabled the insured during the same period.

Additionally, we note that the SPD contains even broader language, informing Plan participants that LTD benefits are unconditionally offset by SSDI benefits. While we do not view this difference as one creating a conflict between the two versions, we find it instructive. Also of importance is the fact that Liberty informs Plan participants in both versions that failure to apply for SSDI benefits will result in an automatic reduction of LTD benefits in an amount equal to the expected SSDI payment.

Plaintiff relies heavily on *Camarda v. Pan American World Airways, Inc.*, 956 F. Supp. 299 (E.D.N.Y. 1997), *aff'd* 162 F.3d 1147 (2d Cir. 1998), for the proposition that "same" so qualifies "Disability" that it must mean "same diagnosis." *Camarda* concerned an analogous situation where plan benefits were reduced by SSDI benefits received "on account of the Employee's disability." *Camarda*, 956 F. Supp. at 306. An administrative law decision regarding the plaintiff's Social Security claim awarded Camarda SSDI benefits, noting that he suffered from both physical and mental conditions. The insurance company in that case awarded the plaintiff LTD benefits on account of his physical condition alone. Camarda argued, therefore, that his plan benefits should not have been offset because the LTD and SSDI benefits were not for the same disability. The Second

15

Circuit upheld the district court decision that the reduction of LTD benefits was warranted where "'from a physical standpoint alone'" the plaintiff was disabled and where the plaintiff's "mental disability was influenced by his preexisting physical disability." *Camarda*, 162 F.3d at 1147 (citing to ALJ's reasoning); *see also Camarda*, 956 F. Supp. at 309-10.

Plaintiff argues *Camarda* is instructive in that Liberty's Plan expressly includes the word "same," and Liberty, by intentionally ignoring that word, rendered its interpretation arbitrary and capricious. We disagree. Liberty may have reclassified plaintiff's primary sickness as physical, but it never eliminated its long-standing recognition of plaintiff's mental illness and anxiety disorder.[8] Thus, even if the offset decision were deemed contingent upon diagnosis, those disabilities would remain, as the records of Dr. Hurwitz, the treating psychiatrist, reflect. Also, the administrative record makes clear that plaintiff's mental sickness is causally related to her physical problems regardless of the fact that schizophrenia suggests an independent psychiatric disorder. We observe that there is no explanation behind the SSA's citation of schizophrenia or anxiety disorder as the basis of its award decision; that "diagnosis" is provided in a one paragraph letter stating the basis for plaintiff's award. Plaintiff also focuses on *Gruber v. UNUM Life Insurance Company of America*, 195 F. Supp. 2d 711 (D. Md. 2002), in which the court held that the defendant wrongfully offset its disability payments due to receipt of workers' compensation and social security benefits. There, the district court noted "it is ambiguous whether SSA's inclusion of depression and post-traumatic stress

---

[8] To the extent plaintiff argues Liberty failed to set forth the basis for its decision or failed to amass proper objective evidence due to its failure to investigate the SSDI diagnosis of schizophrenia, those arguments must fail. First, Liberty's letters to Bacquie and her attorneys clearly set forth the reasons supporting its interpretation. (*See* AR 751-54; *see also* AR 222-25.) Second, the administrative record reveals a lengthy history of Liberty's examination and review of plaintiff's medical history; Bacquie's medical records are devoid of any mention of schizophrenia.

disorder as non-primary impairments means that the SSA benefits were payable for the same disability." *Id.* at 719. That ambiguity required resolution in favor of the plaintiff. In the instant action, we see no ambiguity in Liberty's interpretation given the plain meaning, as discussed above, attributed to "Disability." *See Fay*, 287 F.3d at 104. Moreover, under the arbitrary and capricious standard of review employed here, Liberty's reasonable interpretation is given deference. *See Jordan*, 46 F.3d at 1273. In addition, the court in *Gruber* assumed that disability was synonymous with diagnosis, observing that the insurance company "disregarded" plaintiff's physical injuries in making its disability determination. *See Gruber*, 195 F. Supp. 2d at 719. Liberty, on the other hand, devoted considerable attention to examining the effects of Bacquie's physical and mental conditions on her ability to return to work. The record indicates that plaintiff's doctors found her "mental" condition stems from the physical disability for which her LTD benefits were originally approved. There is no mention in plaintiff's medical records of schizophrenia.

Consequently, we do not view Liberty's interpretation of the "same Disability" language as referring to a concurrent time period rather than an identical diagnosis as arbitrary and capricious. *See Campos v. Mut. of Omaha Ins. Co.*, 23 F. App'x 614, 615 (under *de novo* review, court concluded "that the plan administrator's decision—based in part on interpreting 'same disability' to mean 'based upon the same period . . . and cause of disability,' and not 'based on the same medical diagnosis'—was not an abuse of discretion"). The plain meaning is spelled out in the definition of "Disability" as provided in both the Plan and the SPD. The word "diagnosis" is not used, and this Court refuses to stretch the phrase to redefine its clear meaning. In addition, Liberty spent considerable effort delineating plaintiff's myriad physical and mental conditions and how those conditions impacted her ability to work. Therefore, we hold that Liberty was entitled to offset

17

plaintiff's LTD benefits by an amount equal to her SSDI benefits.

**B.     Attorney's Fees**

Plaintiff has requested attorney's fees but has provided no argument in support of that position. In an ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Since Bacquie has not prevailed on her offset claim, an award of fees is inappropriate. *See Macri v. Aetna U.S. Healthcare*, No. CV-03-3860, 2005 WL 1475416, at *7 (E.D.N.Y. June 20, 2005).

## CONCLUSION

For all of the foregoing reasons, the motion for summary judgment of defendants Liberty Mutual Insurance Company and Liberty Life Assurance Company of Boston is granted, and the cross-motion for summary judgment of plaintiff Ena Mae Bacquie is denied. Judgment to be entered by the Clerk of the Court.

SO ORDERED.

Dated:  White Plains, New York
        June 21, 2006

                                                     _____
                                                     Sr. United States District Judge